UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>WILLIAM BAXTER, )<br>)<br>Defendant ) | No. 21-cr-10161-PBS |

# GOVERNMENT SENTENCING MEMORANDUM

The government respectfully requests that the Court sentence the defendant to twelve months and one day of incarceration followed by a three-year term of supervised release, a fine within the Guideline range determined by the Court (unless the Court determines that the defendant cannot pay), along with restitution in the amount of $9,223.

## FACTS

### The Evidence Warehouse

The Boston Police Department ("BPD") leases two buildings located at 1555 Hyde Park Avenue in Hyde Park which serve as the Boston Police Evidence Warehouse.  Sworn police officers assigned to the warehouse, which include approximately ten members of the Evidence Control Unit ("ECU") work from 7:30 a.m. to 4:00 p.m. Mondays through Fridays.   The members of the ECU include a Lieutenant or Captain, two Sergeants, and five or more police officers.

1

The members of the ECU control access to the warehouse and their duties include: storing and cataloging new evidence, including drug evidence, retrieving evidence for use in court, and transporting the evidence when necessary.

### **Purge Overtime**

In or around 2011, the ECU ran out of space for new evidence. The BPD consequently approved a program called "purge overtime," which allowed ECU officers to work an overtime shift to dispose of old and unneeded evidence, organize the evidence at the warehouse more efficiently, scan older evidence into newer computer systems so that it can be tracked more effectively, and thereby create space for the intake of new evidence. This purge overtime shift ran from 4 p.m. to 8 p.m., most often Monday through Thursday, and was performed by four or more ECU line officers (patrolmen/patrolwomen) and one or more supervisors (either a sergeant, lieutenant, or captain). Because purge overtime followed the officers' regular shift, it was paid on an hour-for-hour basis, in 15-minute increments. Additionally, because purge overtime required officers to manually sort evidence, purge overtime could not be performed remotely.

Overtime hours are reported using an overtime slip, an example of which is shown below, which requires officers to state their name, overtime purpose, start time, end time, and actual hours worked. The overtime slips must be signed by the employee working overtime as well as the supervisor and commander, and an overtime slip must be submitted for each and every overtime shift. Notably, BPD's overtime slip—in bold and underline—asks BPD employees to list the "Actual Hours Worked" for each overtime shift:



On this particular day, May 10, 2016, Sgt. Baxter (along with others performing the "purge" overtime) claimed to have worked from 4-8 p.m. Here, Sgt. Baxter is representing that he worked 4– 8 p.m. (1600-2000), in the warehouse "ECU," and that they "actually worked" 4 hours of overtime. Contrary to what was represented in this overtime slip, the alarm records show that Baxter and the other officers of the ECU left at 5:55 p.m. (more than two hours early).

Overtime slips have to be signed by an individual holding higher rank. There are two signatures for supervisors, one for the supervisor who certified that the hours were actually worked, and one for the supervisor empowered to authorize the overtime. For the members of the ECU, Captain Evans, Lt. Torigian, or one of the sergeants, like Baxter, would most often sign the slips. Slips could also be signed by BPD commanders at Headquarters.

## BPD Warehouse Alarms

The BPD Warehouse is extensively alarmed, with alarms on each outer door, separate alarms on various trailers and safes within the building, and, internal motion sensors. Once the perimeter alarm is set, any person inside the building would either trigger the motion sensors, or, would have to disarm the alarm in order to exit the building. Data from the alarm system, including when it was set and disarmed on a given date, and by whom, was maintained by the City of Boston.

## The Criminal Conspiracy

From at least January 2015 through in or about February 2019, Baxter and co-conspirators conspired to be paid for hours they did not work by submitting false and fraudulent overtime slips in which they claimed to have worked a full "purge" or "kiosk" overtime shift when in fact they did not.

As supervisors, Baxter and others supervisors in the ECU, such as Captain Richard Evans, Timothy Torigian, and Sergeants George Finch, Robert Twitchell, and Gerard O'Brien, routinely agreed to endorse overtime slips for themselves and their subordinates certifying that they and their subordinates had worked a full four hour "purge" shift when Baxter and the other supervisors knew that they had not done so. *See* Case No. 21-10161-PBS - Rule 11 Transcript, [D. 50], p. 20-21.[1]

Between March 2015 through June of 2016, which is the time period in which Baxter was assigned to the Warehouse, Baxter, other supervisors, and the officers of the ECU, submitted hundreds of false and fraudulent overtime slips in which they claimed to have worked a full four hour "purge" shift, despite the fact that the Warehouse perimeter alarm was set well before the end of the shift. Though Baxter and other supervisors knew that these BPD overtime slips, and others, were false and fraudulent, Baxter and other supervisors endorsed the false and fraudulent overtime slips.

By way of specific example, on a date on which the conspirators left the warehouse at 5:21 p.m., (PSR, ¶19) Baxter endorsed fraudulent slips of subordinate officers claiming to have "actually worked" from 4-8 p.m.

---

[1] Lieutenant Torigian, Sgt Twitchell, and two other charged officers were acquitted after trial.

[Boston Police Overtime Authorization/Record form for SMALLS, CRAIG — ID 009800, Rank 09, Unit 32020, OT Code 332; Purpose: PURGE; Location: ECU; OT Call Sign: SE09; Start 16:00, End 20:00, Actual Hours Worked 04:00; Start Date 07/09/2015; Supervisor BAXTER ID 010504 Rank 07; Commander CALLAHAN ID 009477 Rank 99; District/Unit 32000.]

[Boston Police Overtime Authorization/Record form for LOPEZ, Diana — ID 009370, Rank 09, Unit 32020, OT Code 332; Purpose: PURGE; Location: ECU; OT Call Sign: SE03; Start 16:00, End 20:00, Actual Hours Worked 04:00; Start Date 07/09/2015; Supervisor BAXTER ID 010504 Rank 07; Commander CALLAHAN ID 009477 Rank 99; District/Unit 32000.]

### Government's Loss Calculation

The loss attributed to individual officers by the government was calculated by comparing the hours claimed in purge overtime slips to the times that the alarm records show the officers actually stopped working.[2] Based upon a comparison of the overtime hours claimed versus the time that the building alarm was set, from at least March 2015 through in or about June 2016,

---

[2] This methodology was laid out in testimony of an FBI forensic accountant in two separate trials. *See* Case No. 20-10164-NMG [D. 386], Trial Transcript, p. 35-64; Case No 21-10093-RGS [D. 122], Trial Transcript, p. 17-65.

5

Baxter personally received approximately $9,223 for overtime hours that he did not work. During the tenure of Baxter from at least March 2015 through in or about June 2016, the members of the conspiracy received approximately $135,974 for overtime hours that they did not work while performing "purge" overtime shifts.

## Advisory Sentencing Guidelines

### A.    Government's Calculation

The government's position with respect to the Sentencing Guidelines are set forth in the Plea Agreement [D. 2], p. 2:

> a) Defendant's base offense level is 6, because the offense of conviction has a statutory maximum term of less than 20 years (USSG § 2B1.1(a)(2));
> b) Defendant's offense level is increased by 8, because the reasonably foreseeable loss is greater than $95,000 but less than $150,000 (USSG § 2B1.1(b)(1)(E));
> c) Defendant's offense level is increased by 4, because defendant was a leader/organizer/supervisor of a criminal activity involving five or more participants, (USSG § 3B1.1);
> d) Defendant's offense level is increased by 2, because defendant abused a position of trust, (USSG § 3B1.3); and
> e) Defendant's offense level is decreased by 3, because Defendant has accepted responsibility for Defendant's crimes, and has timely notified authorities of his intention to plead guilty thereby permitting the government and the Court to allocate their resources efficiently (USSG § 3E1.1).

The government has calculated the total offense level to be 17. Baxter's criminal history category is I, which results in a GSR of 24 to 30 months' imprisonment.

### B.    Probation's Guideline Calculation

Probation's calculation differs from the government's in two material respects. PSR, ¶¶ 31, 33, and Objections, p. 29-33. Probation has determined that Baxter should be attributed a three (rather than four) level increase for his supervisory role in the offense. PSR, ¶¶ 33. Probation has further concluded that the entirety of the loss from this scheme during Baxter's tenure at the warehouse should not be attributed to him. Instead, Baxter could only reasonably foresee fraud of

co-conspirators occurring on days when Baxter actually worked, and left early from, a purge shift. PSR, ¶¶ 31 and Objections, p. 29-33.  The total amount of loss attributable to Baxter under that theory has been calculated to be $47,013.

Probation has calculated the total offense level to be 14.  Baxter's criminal history category is I, which results in a GSR of 15-21 months' imprisonment. PSR, ¶¶ 39, 91.

## ARGUMENT

### I. Guidelines Calculations

#### A. Loss Amount

The government believes that a loss amount of $135,974 is appropriately attributed to Baxter based upon the loss to BPD resulting from the purge overtime scheme during Baxter's tenure.  Probation has taken a narrower view.  Probation does not believe that loss occurring pursuant to this scheme on days that Baxter did not work a purge overtime shift can be attributed to him as "reasonably foreseeable."  In declining to attribute the remaining loss, Probation relates, "[t]here is insufficient evidence to hold defendant accountable for over $90,000 of loss that wasn't specifically known to him, incurred as part of jointly undertaken criminal activity, or reasonably foreseeable to him." PSR, Objections, p. 32.  Instead, Probation believes that fraudulent overtime slips submitted by co-conspirators on days when Baxter worked, represent foreseeable loss (a figure of approximately $47,013).

The government believes that Probation has applied the "reasonably foreseeable" standard too restrictively in this matter.  Based on the facts, both the Guidelines and caselaw dictate a conclusion that the losses attributable to Baxter's co-conspirators during his time participating in the conspiracy, represent jointly undertaken criminal activity, which was within

7

the scope of the agreed criminal activity, occurred in furtherance of that agreed criminal activity, and was reasonably foreseeable to Baxter.

As a starting point, this charge involves a conspiracy, the very definition of a jointly undertaken criminal activity, or, as the Guidelines provide, "a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others." U.S.S.G. § 1B1.3(a)(1)(B).  In the case of jointly undertaken activity, the court "must make an individualized determination regarding the amount of loss attributable to, or reasonably foreseeable by, a defendant." *United States v. Codarcea*, 505 F.3d 68, 72 (1st Cir. 2007); USSG §1B1.3(a)(1)(B).  "This task requires the court to ascertain what activity fell within the scope of the specific conduct and objectives embraced by the defendant's agreement. The court must then determine to what extent others' acts and omissions … would have been foreseeable by a reasonable person in defend'nt's shoes at the time of his or her agreement." *Id*.

With respect to the scope and objectives of the agreement, Baxter's admission in the Rule 11 proceedings makes clear the scope and objectives of the agreement.  Baxter agreed to engage in a scheme with his co-conspirators to defraud the BPD utilizing fraudulent purge overtime submissions made during his tenure at the Evidence Warehouse, which lasted from March 2015 through June 2016.  *See* Case No. 21-10161-P–S - Rule 11 Transcript, [D. 50], p. 20-21.   The conduct at issue, the submission of fraudulent overtime slips by co-conspirators during Baxter's tenure, "f[a]ll[]s within the scope of the specific conduct and objectives embraced by the defend'nt's agreement." *Cordaracea, supra*.  The fraudulent overtime slips, whether submitted by Baxter, or, someone else, were submitted in furtherance of the conspiracy they all joined to steal money from the BPD by fraudulently representing the hours worked during purge overtime.

8

The members of the ECU, both supervisors and officers, were aware of the hours and frequency of the purge overtime shift (Mon.-Thurs., 4-8pm).  Officers and supervisors participating in this conspiracy were aware that they were consistently working two hours or less of those shifts, but lied about it.  All of the participants were aware that everyone was leaving early (the participants would have to leave together in order to set the alarm).  And this conduct occurred on hundreds of occasions, over years.  This was one unit, working at one single location, engaged in a scheme to steal money from the BPD by submitting fraudulent overtime slips for the 4-8pm purge overtime shift.  It was eminently foreseeable to Baxter that his co-conspirators, working exactly the same overtime purge shifts, at exactly the same location, often with exactly the same co-conspirators, would engage in exactly the same conduct that Baxter himself did with them, i.e., leaving early from the purge shift and collectively lying about it.

It is difficult for the government to believe that Baxter did not know, let alone reasonably foresee, that his co-conspirators would do exactly what they did with Baxter and exactly what they all agreed to do with each other.   Conversely, it makes little sense to the government to believe that Baxter, leaving purge shifts with his co-conspirators on Monday and Thursday on a given week at 6pm, could not foresee that those same co-conspirators would also leave at 6pm from the same overtime shift on Tuesday and Wednesday.  Let alone, that it would not be foreseeable to Baxter that such was occurring the tenth, twentieth, or fiftieth week that they all engaged in such actions.  This conduct (and Baxter's own participation in it) occurred on hundreds of occasions, over years.

The evidence in this matter supports the inference that Baxter knew exactly what his co-conspirators were doing (even when he was not present).  But that inference isn't even required

9

to support a finding of attributable loss. "Reasonable foreseeability is broader than knowledge." *United States v. Ford*, 73 F.4th 57, 66 (1st Cir. 2023).[3]

In the view of the government, the fact that his co-conspirators would engage in exactly the same conduct Baxter agreed to engage in with them, *i.e.,* lying about working a full purge overtime shift, was entirely foreseeable – even on days Baxter, himself, did not work. Thus, the theft occurring during Baxter's tenure at the warehouse represents conduct: that was within the scope of the agreement Baxter entered into with his co-conspirators, USSG §1B1.3(a)(1)(B)(i); in furtherance of the conspiracy, USSG §1B1.3(a)(1)(B)(ii); and wholly foreseeable to Baxter, USSG §1B1.3(a)(1)(B)(iii). In the government's view, the entire loss to the BPD during his tenure from the fraudulent purge overtime submissions should be attributed to Baxter under USSG §1B1.3(a)(1)(B).[4]

B. <u>Aggravating Role Enhancement</u>

Probation and the government differ on whether a three point, or four point, enhancement is appropriate under USSG §3B1.1(b) or (c). The government believes that the factors set forth in the Guidelines support a four-level enhancement. With respect to this issue, the Guidelines provide:

> In distinguishing a leadership and organizational role from one of mere management or supervision, titles such as "kingpin" or "boss" are not controlling.

---

[3] Indeed, in the context of fraud schemes, the First Circuit has upheld a finding that conduct broader than that undertaken by a specific defendant can be foreseeable under Section 1B1.3. *See United States v. Iwuanyanwu*, 69 F.4th 17, 22 (1st Cir. 2023) (concluding that it was reasonably foreseeable to a defendant who used "fraudulent corporate documents to open bank accounts used to perpetrate … fraud" that other members of the conspiracy "could use false identities when opening additional bank accounts in furtherance of the conspiracy.")

[4] The specific figures supporting the government's estimate are detailed in <u>Exhibit 1</u>, hereto. The loss was calculated by comparing the hours claimed in purge overtime slips to the times that the alarm records show the officers actually stopped working. This methodology was laid out in testimony of an FBI forensic accountant in two separate trials. *See* Case No. 20-10164-NMG [D. 386], Trial Transcript, p. 35-64; Case No 21-10093-RGS [D. 122], Trial Transcript, p. 17-65.

> Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.

USSG § 3B1.1, Application Note 4.

Baxter had significant control over the officers by virtue of his position. Baxter significant decision making authority by virtue of his status as a supervisor. The nature of Baxter's participation, signing slips as a supervisor, further demonstrates a more significant role in the scheme. That Baxter was not the highest-ranking officer at the warehouse does not foreclose a finding that he was a leader. *United States v. Coplin-Benjamin*, 79 F.4th 36, 42 (1st Cir. 2023).[5]

## II.     Government's Sentencing Recommendation

The factors set forth in 18 U.S.C. §3553(a), including: the nature and circumstances of the offense; the history and characteristics of the defendant; and the need for the sentence imposed to reflect the seriousness of the conduct; dictate a sentence of twelve months and one day of incarceration, a three year term of supervised release, a fine within the Guideline sentencing range calculated by the Court (unless the Court finds that the Defendant is not able to pay a fine) and the payment of $9,223 restitution to the BPD.

The nature of the offense calls for a significant sentence. Trusted by the Boston Police Department to ensure that the officers he supervised actually worked the overtime hours they

---

[5] Having noted that, the government also acknowledges that Probation's view is by no means unreasonable. *See United States v. Cortes-Caban*, 691 F.3d 1, 28 (1st Cir. 2012) (upholding a three-point enhancement in a matter involving police corruption and noting "Santiago's official position was as a supervisor in the division.").

claimed, Sergeant Baxter used that trust to enable this crime. Sergeant Baxter should have set an example for the officers he supervised. Instead, he and the other officers conspired to steal public money. The defendant, a ranking member of the Boston Police Department, supervised, and participated in, a conspiracy to steal overtime pay for hours that were never worked. That Sergeant Baxter, as a police officer, chose to break, rather than uphold, the law, is indefensible.

This was not an isolated incident. As outlined more fully in the PSR, Baxter and his co-conspirators submitted hundreds of false and fraudulent overtime slips over a period of years.

The issue of payroll abuse by law enforcement has been a recurring one in this Court with many officers of the State Police, Boston Police, and Quincy Police having been convicted of various forms of payroll abuse.[6] Prior convictions alone have not deterred such conduct. The conduct in this matter continued, despite a 2018 high-profile prosecution of members of the State Police Turnpike Unit for similar overtime fraud. This history of similar prosecutions highlights the need for this sentence to serve as both a general and specific deterrent. Officers cannot believe themselves immune from consequences for stealing and violating the public trust.

The government recognizes a number of significant mitigating factors at play in this action, including health issues more fully detailed in the PSR. PSR, ¶¶69-77. But even considering those factors, the government believes that a sentence of twelve months and one day of incarceration followed by a three-year term of supervised release, a fine within the Guideline

---

[6] *See US v. Griffin and Robertson*, 20-cr-10319-MRG (State Police); *US v. O'Brien, Murphy, Carnes and Lopez*, 20-10164-NMG (co-conspirators in BPD); *US v. J. Nee*, 21-10177-PBS (co-conspirator); *US v. Finch*, 21010149-LTS (co-conspirator); *US v. T. Nee*, 21-10294-RGS (co-conspirator); *US v. Smalls*, 21-10192-ADB (co-conspirator); *US v. Raftery*, 18-cr-10203-WGY(State Police); *US v. Cesan*, 18-10383-DPW(State Police); *US v. Herman*, 18-10326-RWZ(State Police); *US v. Chin*, 18-10384-RGS(State Police); *US v. Sweeney*, 18-10286-NMG(State Police); *US v. Wilson*, 18-10290-RGS(State Police); *US v. DeJong*, 18-10307-MLW(State Police); *US v. McAuliffe*, 19-10056-DJC(State Police); and *US v. Corliss*, 16-cr-10250-LTS (Quincy Police).

range determined by the Court (unless the Court determines that the defendant cannot pay), along with restitution in the amount of $9,223, represents the appropriate sentence in this matter.

    Respectfully submitted,

    JOSHUA S. LEVY
    Acting United States Attorney

By:    /s/ Mark J. Grady
    Mark J. Grady
    Assistant U.S. Attorney

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that this document, filed under seal, was served by electronic mail message to counsel for the defendant on June 14, 2024.

    /s/ Mark J. Grady
    Mark J. Grady
    Assistant U.S. Attorney